Filed 11/21/13  Ochoa v. Valverde CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOSE OCHOA, | H037350 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. CV195873) |
| v. | |
| GEORGE VALVERDE, as Interim Director, etc., et al., | |
| Defendants and Respondents. | |

Plaintiff Jose Ochoa was arrested for driving under the influence (Veh. Code, § 23152, subd. (a))[1] and his driving privilege suspended by the Department of Motor Vehicles (DMV) following an administrative per se (APS) hearing at which the hearing officer found that Ochoa's arrest was lawful.  That decision was upheld on review by the DMV.  In concurrent criminal proceedings, however, Ochoa's Penal Code section 1538.5 motion to suppress evidence was granted on the ground his arrest was unlawful, and the criminal proceedings were dismissed on the People's motion.  Ochoa filed a petition for review or administrative mandamus in the trial court, seeking to overturn the suspension of his driving privilege.  His writ was denied.

On appeal, Ochoa claims he was unlawfully arrested and both the DMV and the trial court erred in failing to exclude evidence of his blood alcohol content.  We agree

---

[1] Further unspecified statutory references are to the Vehicle Code.

that Ochoa's arrest was unlawful and that the DMV could not therefore suspend his license. Accordingly, we shall reverse the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 24, 2010, at 12:43 a.m., Officer Jason Broyer and his partner, Officer DeLuna, were on patrol in Morgan Hill when Broyer saw Ochoa driving in the opposite direction. Ochoa failed to dim his high beams as he approached and Broyer had to slow down and look off to the right side due to the brightness of Ochoa's headlights. Broyer made a U-turn to follow Ochoa, who rapidly accelerated and turned at the next intersection. Ochoa made a second turn and pulled into the driveway of his residence. Broyer activated his code 3 lights as he pulled into the driveway behind Ochoa, who was then driving into his garage. Ochoa activated the automatic garage door which began to close, so Broyer got out of his patrol car, "ran up [*sic*] the garage door" to prevent it from closing and allow him to maintain his view of Ochoa and the three passengers in the car. DeLuna radioed for additional patrol units as Ochoa and the passengers seemed uncooperative.

According to the police report, Broyer twice asked Ochoa to step out of the garage to talk, but Ochoa refused, both times saying "No, get the hell out of my house." Broyer asked a third time, threatening to physically escort Ochoa out if he continued to refuse, at which point Ochoa complied.

According to Ochoa, however, Broyer entered his garage without permission. Ochoa asked him to get out, but Broyer refused and threatened to drag Ochoa outside if he did not come out of the garage with him. When Ochoa told Broyer he had no right to be in his home, Broyer again said he would drag Ochoa outside if he did not step out voluntarily. When Broyer started to move behind him, Ochoa stepped outside because he was afraid of the officer.

As Broyer began talking to Ochoa, other officers arrived and one of the car's occupants ran through the interior garage door to the house, shutting the interior door

2

behind him. To protect his own safety and that of the other officers, Broyer put Ochoa into the rear seat of his patrol car as the other officers regained control of the scene.

Once the situation was under control, Broyer had Ochoa exit the patrol car and he explained the reason for stopping him. Ochoa admitted his high beams were on because the road was very dark and he forgot to turn them off. As they spoke, Broyer noticed that Ochoa's eyes were watery and bloodshot and he smelled moderately of alcohol both on his breath and his person. Ochoa admitted having "a few glasses of wine with dinner." Broyer conducted several field sobriety tests on Ochoa, all of which he failed.[2] Breath tests yielded blood alcohol content readings of .080 percent and .079 percent.

Ochoa was placed under arrest for suspected drunk driving and transported to the police department for booking. While still at the scene, Broyer made contact with Ochoa's son who apologized for his father's conduct and said he did not know why his father tried to shut the garage door when they saw the police car behind them in the driveway with its lights activated.

At the police department, Ochoa refused to submit to a chemical test and invoked his *Miranda*[3] rights.

On September 28, 2010, an APS hearing was held by the DMV. After considering the evidence and arguments presented, the hearing officer found: (1) Broyer had reasonable cause to believe Ochoa was driving a vehicle in violation of sections 23140, 23152 or 23153, or Penal Code section 191.5; (2) Ochoa was lawfully arrested; (3) Ochoa was advised his driver's license would be suspended or revoked if he refused to complete required testing; and (4) Ochoa refused or failed to complete the required testing despite

---

[2] Ochoa declined to perform the test in which he was required to balance on one foot for approximately 10 seconds, claiming that preexisting "ACL injuries" to both knees prevented him from accomplishing that feat.

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

being asked to do so by a peace officer.  Ochoa sought review of this decision by the DMV, but it was affirmed and his driving privileges were suspended for two years.

In concurrent criminal proceedings, Ochoa moved to suppress evidence pursuant to Penal Code section 1538.5 arguing his Fourth Amendment rights had been violated and his arrest was therefore unlawful.  Following a hearing on November 19, 2010, the trial court granted the motion to suppress.  The criminal charge was dismissed and the People notified the DMV that the dismissal was due to "unlawful arrest."

Ochoa's petition for review or, in the alternative, writ of administrative mandamus seeking to overturn the suspension of his driver's license was denied by the trial court. He timely appealed from the judgment entered against him on that petition.

## II.  DISCUSSION

### A.  *Standard of review*

"In ruling on an application for a writ of mandate following an order of suspension or revocation, a trial court is required to determine, based on its independent judgment, ' "whether the weight of the evidence supported the administrative decision." ' " (*Lake v. Reed* (1997) 16 Cal.4th 448, 456 (*Lake*).)  On appeal, we " 'need only review the record to determine whether the trial court's findings are supported by substantial evidence.' [Citation.]  ' "We must resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision." ' " (*Id.* at p. 457.)  "If the facts are undisputed and the issue presented is a question of law . . . , we conduct an independent review." (*Arburn v. Department of Motor Vehicles* (2007) 151 Cal.App.4th 1480, 1484.)

### B.  *Brief outline of APS procedure*

"Under the administrative per se law, the DMV must immediately suspend the driver's license of a person who is driving with .08 percent or more, by weight, of alcohol in his or her blood.  [Citation.]  The procedure is called 'administrative per se' because it does not impose criminal penalties, but simply suspends a person's driver's license as an

administrative matter upon a showing the person was arrested for driving with a certain blood-alcohol concentration, without additional evidence of impairment.  [Citation.]  The express legislative purposes of the administrative suspension procedure are:  (1) to provide safety to persons using the highways by quickly suspending the driving privilege of persons who drive with excessive blood-alcohol levels; (2) to guard against erroneous deprivation by providing a prompt administrative review of the suspension; and (3) to place no restriction on the ability of a prosecutor to pursue related criminal actions." (*MacDonald v. Gutierrez* (2004) 32 Cal.4th 150, 155.)

When a person is arrested for driving under the influence and refuses or fails to complete a chemical test or tests, the arresting officer serves the person with a "notice of the order of suspension or revocation."  (§§ 23612, subd. (e), 13353, subds. (a) & (c).) The notice informs the person that his or her driver's license will be suspended 30 days from the date of service, states the reason and statutory grounds for the suspension, and explains the person's right to seek an administrative hearing.  (*Lake*, *supra*, 16 Cal.4th at p. 455.)  "The administrative hearing is held before either the director of the DMV, a hearing board or, more usually, a department hearing officer (§ 14104.2, subd. (a))."  (*Id.* at p. 456.)

In a DMV administrative hearing in a refusal case, the DMV is required to suspend a person's driving privilege if it determines by a preponderance of the evidence that (1) a "peace officer had reasonable cause to believe that the person had been driving a motor vehicle" under the influence of alcohol or drugs (§ 13557, subd. (b)(1)(A)), (2) "[t]he person was placed under arrest" (*id.*, subd. (b)(1)(B)), (3) "[t]he person refused or failed to complete the chemical test or tests" (*id.*, subd. (b)(1)(C)) and (4) "the person had been told that his or her [driving privilege] would be suspended or revoked if he or she refused to submit to, and complete, the required testing." (*Id.*, subd. (b)(1)(D).)  The DMV may not suspend or revoke a person's license under the implied consent statute

5

(former § 23157, now § 23612) and section 13353 unless that person is " 'lawfully arrested.' " (*Mercer v. Department of Motor Vehicles* (1991) 53 Cal.3d 753, 760.)

    *C.    Fourth Amendment principles regarding*: *warrantless arrests*

    "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." (*Devenpeck v. Alford* (2004) 543 U.S. 146, 152.) When the arrest occurs in the home or, as in this case, an attached garage, additional principles come into play. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." (*Payton v. New York* (1980) 445 U.S. 573, 586.) Indeed, "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (*Id.* at p. 585.)

    Penal Code section 844 provides: "To make an arrest, a private person, if the offense is a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing the person to be, after having demanded admittance and explained the purpose for which admittance is desired." It is well established the "knock and notice requirements [of Penal Code section 844] are fully applicable to an entry by a peace officer into a detached garage located on occupied residential property to investigate possible criminal activity occurring therein." (*People v. Bruce* (1975) 49 Cal.App.3d 580, 587.)

    The presumption of unreasonableness that attaches to a warrantless entry into the home "can be overcome by a showing of one of the few 'specifically established and well-delineated exceptions' to the warrant requirement [citation], such as ' "hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a

6

suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling" ' [citation]. The United States Supreme Court has indicated that entry into a home based on exigent circumstances requires *probable cause* to believe that the entry is justified by one of these factors such as the imminent destruction of evidence or the need to prevent a suspect's escape." (*People v. Celis* (2004) 33 Cal.4th 667, 676.)

  *E. Ochoa's arrest was unlawful*

  In this case, Ochoa first came to Broyer's attention because Ochoa failed to dim his vehicle's headlights as they approached each other on a dark road, and Broyer had to avert his eyes and slow down because of the brightness of Ochoa's lights. Broyer made a U-turn and followed Ochoa, but only activated his patrol lights once he pulled into the driveway of Ochoa's home. There was conflicting evidence of when Ochoa saw those lights: Ochoa said the garage door was approximately three-quarters closed when he saw the lights, whereas his son told Broyer "he did not know why [Ochoa] shut the garage when they saw the police car with the lights activated in the driveway." Broyer's report indicates that he was able to "maintain[] a visual on the driver as he exited the [driver's] seat," which would be difficult to do if the garage door were closed as much as Ochoa claims.

  Regardless of when Ochoa saw the lights of the patrol car, the fact remains that he was inside his attached garage with the door closing when Broyer exited his vehicle and "ran up" to the garage door. Broyer does not explain how he prevented the garage door from closing, but presumably he did so by either crossing the threshold or interrupting the downward motion of the door, either of which would cause it to reopen. Prior to preventing the garage door from closing, Broyer did not identify himself as a police officer or state why he was parked on Ochoa's driveway.

  At the time Broyer interfered with the garage door closing, all he knew was that Ochoa had not switched off his high beams when another vehicle was approaching, as required by section 24409, subdivision (a). Broyer's report did not indicate that, as he

7

followed Ochoa to his house, Ochoa exceeded the speed limit, failed to stop at stop signs or red lights, weaved into the opposite lane, or otherwise operated his vehicle in an unsafe or unlawful manner. It was only *after* Ochoa exited the garage, when Broyer threatened to "escort him out" if he refused again, that Broyer observed Ochoa's "bloodshot/watery eyes and . . . smell[ed] a moderate odor of an alcoholic beverage emitting from his breath and person."[4]

Consequently, at the time of Broyer's unlawful entry into Ochoa's garage, there were no exigent circumstances justifying his interference with the closing of the door. He was following someone who had failed to dim his headlights. That offense is neither a felony nor a misdemeanor. There was no evidence of that infraction which Ochoa could destroy.

The People cite *People v. Lloyd* (1989) 216 Cal.App.3d 1425 (*Lloyd*) for the proposition that a suspect should not be permitted to flee into a private sanctuary in order to avoid a detention that was initiated in a public place, and claimed at oral argument that the arrest in the instant case was justified as a "hot pursuit." According to the People, because Ochoa "sped up" after Broyer made a U-turn to follow him, Ochoa was attempting to evade the police. We disagree.

In *Lloyd*, the defendant ran a red light, and was pursued by police who activated their emergency lights. While being pursued by the police, the defendant ran a stop sign before being stopped in front of residence. (*Lloyd*, *supra*, 216 Cal.App.3d at p. 1427.) After being advised by police he would be cited for a traffic violation, the defendant went inside his house and refused to come out, forcing the officers to drag him out. (*Ibid.*) On appeal, the court held "a suspect may not defeat a detention or arrest which is set in motion in a public place by fleeing to a private place." (*Id.* at p. 1430.)

---

[4] At oral argument, the People conceded it was only after Broyer placed Ochoa in his patrol car that he discovered evidence Ochoa was intoxicated.

8

Here, however, there is no evidence that Broyer initiated Ochoa's detention in a public place or that Broyer engaged in a "hot pursuit" that evening. Although the People stated at oral argument that Ochoa sped up after Broyer made a U-turn, indicating his desire to avoid the police, there was *no* evidence that Ochoa exceeded the speed limit in doing so or violated any other traffic laws during the time Broyer was following him to his house. Ochoa testified he did not know a police officer was following him until he saw Broyer's patrol car in his driveway. Ochoa's brother said he urged Ochoa to speed up because he had to use the restroom. The act of speeding up may imply Ochoa was trying to get away from Broyer, but without some evidence Ochoa or someone else in the vehicle knew or should have known Broyer was behind them at the time, this was not a pursuit.

Had Broyer activated his emergency lights at any point while he was following Ochoa on the public streets, and had Ochoa at *that* point in time sped up, it would be reasonable to find there was a pursuit.[5] For some unknown reason, however, Broyer *only* turned on his lights as he pulled into Ochoa's driveway,[6] at which point Ochoa was already in his garage. Ochoa denied seeing the lights on Broyer's vehicle until the garage door was already closing. Although Ochoa's son told Broyer he did not know why Ochoa closed the door when "they saw the police car with the lights activated in the driveway," this is not inconsistent with Ochoa's recollection that the garage door was already closing when he first saw the lights.

---

[5] We need not decide and express no opinion on whether, in the absence of evidence of other traffic violations such as exceeding the speed limit, unsafe lane changes, running stop lights, etc., the mere act of speeding up when an officer activates his or her patrol lights is enough to constitute a "hot" pursuit.

[6] The People stated at oral argument that Broyer did not have sufficient time to activate his patrol lights since the pursuit only lasted a minute or two before arriving at Ochoa's home.

9

Since there was no "hot pursuit" justifying Broyer's interference with the closing garage door, his entry into Ochoa's garage was unlawful,[7] as were the subsequent detention and arrest.

    *F.      Without a lawful arrest, there can be no suspension of driving privileges*

The parties further disagree about whether or not the exclusionary rule should apply to DMV administrative hearings, given that the superior court found that Ochoa's arrest was unlawful.  We see no need to resolve that dispute since it is well-settled that the DMV may not suspend or revoke a person's license unless that person is " 'lawfully arrested.' "  (*Mercer v. Department of Motor Vehicles*, *supra*, 53 Cal.3d at p. 760.)  Discussion of the exclusionary rule is a moot point since a necessary precondition for suspension of Ochoa's license, i.e., that he was lawfully arrested, did not occur.

---

[7] If there had not already been an unlawful entry into Ochoa's garage, we think the DMV hearing officer was under no obligation to believe Ochoa's self-serving version of events where Broyer walked into his garage and ordered him outside.  It is highly unlikely a trained police officer would just walk into an enclosed space occupied by four strangers and at least one vehicle, further limiting his room to maneuver, rather than remain on the driveway and direct Ochoa to step outside to speak to him.  Any or all of those individuals might have been armed, or would have ready access to any weapons or items that could be employed as weapons (e.g., wrenches, screwdrivers, etc.) that might have been present in the vehicle or the garage.

10

## III.   DISPOSITION

The judgment is reversed.  The superior court is directed to vacate the judgment denying Ochoa's petition for review/alternative writ of mandamus and enter a new judgment granting the petition.  Ochoa shall recover his costs on appeal.

_____
Premo, Acting P.J.

WE CONCUR:

_____
Mihara, J.

_____
Márquez, J.

11